IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 7, 2008 Session

## STATE OF TENNESSEE v. EDDRICK DEVON PEWITTE

**Appeal from the Circuit Court for Gibson County**
**No. 8464     Clayburn Peeples, Judge**

---

**No. W2008-00747-CCA-R3-CD  - Filed January 5, 2009**

---

The Defendant, Eddrick Devon Pewitte,[1] was convicted by a Gibson County jury of one count of aggravated robbery, a Class B felony.  He was sentenced as a Range I, standard offender to twelve years in the Department of Correction.  In this direct appeal, he argues that (1) the State presented evidence insufficient to convict him; (2) the trial court erred by allowing the admission of certain statements he made to police; (3) the State violated a discovery order; and (4) the trial court misapplied enhancement factors in sentencing him.  We conclude that the Defendant's first three points of error lack merit.  We also conclude, however, that the trial court erred in the application of certain enhancement factors.  We remand for resentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part;**
**Reversed in Part; Remanded**

DAVID H. WELLES, J., delivered the opinion of the court, in which THOMAS T. WOODALL and J.C. MCLIN, JJ., joined.

Harold R. Gunn, Humboldt, Tennessee, for the appellant, Eddrick Devon Pewitte.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; and Garry Brown, District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

The events underlying this case began on February 1, 2007.  Early that morning, at about 12:15 a.m., Darlene Weathers was preparing to leave a Humboldt, Tennessee Mapco store after completing her shift as a cashier.  She testified that she was standing outside the front door preparing

---

[1] Defense counsel indicated at trial that the Defendant's name is properly spelled "Edderick."  It is the policy of this Court, however, to spell a defendant's name as it appears in the indictment.

to lock up. She had set the store's alarm and turned off its lights when two men, one of whom held a gun, emerged from around the corner of the store and ordered her back inside. She went back in, and the perpetrators followed. Weathers did not turn the store's lights back on, but she could see that both perpetrators wore dark clothes and ski masks. Weathers could also see, through the eye holes in their ski masks, that both perpetrators were black. One was taller than the other. The taller one held the gun and "stood lookout" at the front door. The shorter perpetrator followed Weathers farther inside the store. She dropped her purse on the counter near the front door as she walked in.

Weathers asked, "what do you want?" One of the perpetrators demanded the money out of the store's safe. Weathers went behind the checkout counter to the safe, explaining that only the manager had the key. She saw two keys on a nearby key ring. After trying to open the safe with both keys and discovering that neither worked, she went to the manager's office and retrieved another key ring she had seen there. Her hands were shaking badly at this point, making it difficult for her to use the keys. The shorter perpetrator told her that she needed to get the safe open and that she looked nervous. Weathers handed him the keys and told him to try. He did so but was also unable to open the safe. The taller perpetrator told Weathers "something like 'you need to get that safe open or I'm gonna shoot.'"

Weathers estimated that these events took about five to ten minutes. At some point, one of the perpetrators "pulled the dial off the silent alarm and it set the alarm off . . . ." "[A] minute after that" Weathers noticed blue lights flashing in the parking lot in front of the Mapco. Both perpetrators exited the store through the front door. One of them took Weathers' purse off the counter as he fled, although Weathers could not say which one. She believed both perpetrators had run to the right as she looked out of the store. She exited the store and showed the police officer which way she had seen the perpetrators run.

Weathers did not identify the Defendant as one of the perpetrators at trial. She noted on cross-examination that, although she had not known the Defendant on February 1, 2006, she knew him by the time of trial as the boyfriend of one of her daughters' friends. After the crime, Weathers had on two occasions spent time around the Defendant at a restaurant where her daughter was employed. Weathers admitted that, even though she had heard both perpetrators speak during the robbery, she did not recognize the Defendant's voice on either of the two occasions at the restaurant.

Officer Jonathan Cook of the Humboldt Police Department was the first officer to arrive at the Mapco, having been dispatched there at about 12:30 a.m. in response to a burglar alarm. He testified that, when he pulled up in his cruiser, he saw "two individuals and a lady" standing inside the Mapco near the front of the store. Officer Cook said that the taller individual, who he estimated was about six-foot- one or six-foot-two inches tall, had a gun pointed at Weathers. Officer Cook estimated that the shorter individual was five-foot-nine or five-foot-ten inches tall. Both wore dark sweaters and had masks on.

Officer Cook stopped his car in the Mapco parking lot. As he began to get out, he saw the two individuals exit the store and run in different directions around the store, one along the right wall

and the other around the left. Officer Cook quickly secured the Mapco, then directed Weathers to go inside and lock the door. Because it had been snowing that night, Officer Cook went around the right side to the back of the Mapco to look for tracks. He found one set of tracks and began to follow it after radioing for help.

Officer Cook first followed the tracks west, parallel to Maple Street. He noticed a second set of tracks appear next to the first. Both sets were spaced "as if they were running." The tracks went behind a storage building, behind a group of trailers, and through a ditch. Another officer joined Officer Cook at about that time. The tracks led them onto Nineteenth Street, where they were joined by a deputy and another officer. The group followed the tracks to the back door of 1816 Mitchell Street, half of a one-story duplex. At that time, the group split up. Officer Cook and Officer Bruce Dodd went to the front door. Officer Cook knocked on the door, identified himself, and asked to be let in. Tanisha Collins opened the door shortly thereafter. Officer Cook said that Collins seemed "excited," apparently because they had entered quickly and with their weapons drawn. Collins immediately said, "I haven't done anything. I haven't done anything." Collins then opened the back door, where the other officers had also requested entry.

As he entered the house, Officer Cook saw a man, later identified as Kelsey Hunt, walking toward the living room. Officer Cook put Hunt on the ground and handcuffed him. He noted that Lieutenant Rob Ellis, Officer Jonathan Parker, and Deputy Joseph Mitchell began to search the house. Rather than joining in the search, Officer Cook stayed with Officer Dodd and monitored Hunt; Lieutenant Ellis later told him that the Defendant had been found hiding under a mattress, but Officer Cook never saw the Defendant in the house. Officer Cook then took Hunt to the police station for questioning. He did not suspect Collins of the Mapco robbery because both of the perpetrators he had seen were "skinny" whereas Collins, a woman five-foot-three or five-foot-four inches tall, was "big" in terms of weight.

Lieutenant Ellis also testified at trial. He served as the Humboldt Police Department's midnight shift commander on the night of January 31 to February 1, 2007. He arrived at the Mapco about three or four minutes after the burglar alarm notification had come in. Officer Cook had already left. It had been snowing for only about thirty minutes at the time, so the tracks leading away from the Mapco were fresh. Lieutenant Ellis eventually met up with Officer Cook, forming a group of four officers. A fifth officer arrived a few minutes later. He testified that he, Officers Cook and Dodd, and Deputy Mitchell went to the front door upon reaching 1816 Mitchell Street, leaving only Officer Parker at the back door. Lieutenant Ellis knocked on the front door and said, "Police Department, Humboldt Police Department, somebody needs to come to the door." After one or two minutes, Collins opened the door. She immediately said, "I'm not involved. They're in the back."

Collins was handcuffed. Lieutenant Ellis could not say whether she was put on the floor, but he testified that standard procedure would dictate she be allowed to sit on the couch. After seeing Hunt subdued, Lieutenant Ellis ordered a search of the house. With Deputy Mitchell, he entered a nearby bedroom, asking "[a]nybody in here? You need to come out with your hands up." They found the Defendant, who Lieutenant Ellis identified at trial, lying on the floor underneath a box

spring and mattress. Lieutenant Ellis and Deputy Mitchell pulled the Defendant off the floor; the Defendant was cooperative. Lieutenant Ellis then had another officer handcuff the Defendant and place him in a squad car. The Defendant was not questioned at this time, and made no statements. Lieutenant Ellis searched the immediate area around where the Defendant had been. He lifted the mattress off of the box spring and saw a .38 caliber pistol. He did not touch the pistol, and at that time decided to immediately call an investigator to the scene. Lieutenant Ellis did not discover anyone in the house besides Collins, Hunt, and the Defendant.

Officer Jonathan Parker also testified at trial. He had been one of the last officers to arrive at the Mapco. He stayed around the back of 1816 Mitchell Street after the group of officers had followed the tracks there. While behind the house, he discovered a purse laying next to an air conditioning unit. Thereafter he went into the house and informed the other officers of his discovery. Besides law enforcement personnel, Officer Parker saw no one in the house but Collins, Hunt, and the Defendant.

Investigator Reynard Buchanan testified that he arrived at 1816 Mitchell Street shortly thereafter, responding to Lieutenant Ellis' call. He spoke to Lieutenant Ellis about the evening's events, including the route the police had taken from the Mapco to their current location. He also secured the .38 pistol in his patrol car, later placing it in an evidence box. This pistol was introduced into evidence at trial; Darlene Weathers identified it as similar in appearance to the gun with which the tall perpetrator had threatened her and Lieutenant Ellis identified it as similar in appearance to the gun he had found. Officer Parker gave Investigator Buchanan the recovered purse. Investigator Buchanan later returned the purse to Weathers, who at trial identified it as the one stolen from her at the Mapco.

At about 1:00 a.m., Investigator Buchanan went to the Mapco and walked to 1816 Mitchell Street along the route Lieutenant Ellis had described to him. At some point, he also spoke to Weathers and took a statement from her.

Upon arriving at the police station, Investigator Buchanan prepared to interview the Defendant. He began their discussion between 5:00 and 5:30 a.m. by reading the Defendant his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Investigator Buchanan then conducted, in accordance with his standard practice, an unrecorded "pre-interview" in which he discussed the morning's events with the Defendant. Investigator Buchanan took handwritten notes.

The Defendant gave various stories during the "pre-interview." The Defendant said that four people were involved in the robbery. He refused to give Investigator Buchanan any information about the two others. The Defendant also said that he had put the .38 pistol under the mattress, after claiming earlier that Hunt had done so. His story eventually crystallized into an account in which the Defendant and Hunt, his cousin, had borrowed the .38 pistol from someone. After meeting at Collins' home, the two of them went to the Mapco. The Defendant said he was the lookout and that, when he realized the Mapco cashier could not open the safe, he turned to Hunt and said, "I'm out of here, man." He said nothing to Weathers. Upon leaving the Mapco, the Defendant saw blue

-4-

lights and ran. The Defendant described the path he took, which Investigator Buchanan recognized as corresponding to the one the police had followed to Collins' house. The Defendant confirmed that the gun recovered in Collins' house was the one he had used in the robbery. The Defendant said he was never planning to shoot Weathers, although Investigator Buchanan found that, upon recovery, the gun was fully loaded and had its hammer cocked.

At 6:33 a.m., Investigator Buchanan ended the pre-interview period and recorded an exchange with the Defendant, part of which we reproduce below, a transcription of which was introduced as evidence and read into the record at trial:

> [Investigator Buchanan]: Ok, [the Defendant] got the gun on the 31st of January uh said the gun is 38 caliber uh is that a revolver or automatic?
> [The Defendant]: Revolver.
> [Investigator Buchanan]: It's going to be a revolver. He said he did not buy it from anybody, but it was given to him today on a loan. I showed him a jacket that uh he wore from 1816 Mitchell Street when he was transported to the station; he said he was not wearing the heavy hooded jacket. I showed him a blue handkerchief and he said it was the one that he wore during the [r]obbery. This handkerchief was around his neck when officers took him into custody. . . . He says that they got to the store by walking they weren't dropped out or anything they walked and that there was four guys in all. He said that when they took out running somebody handed him the gun and that the two other guys did not go to [Collins'] apartment only him and uh Mr. Kelsey Hunt . . . . I showed [the Defendant] a picture of the gun that we recovered from the house, he had inside his, the gun is the one that he had, originally he said [Hunt] put the gun in the mattress, but then he said that uh. Did you, did you say [Hunt] put the gun under the mattress?
> [The Defendant]: At first I did.
> [Investigator Buchanan]: Then I, I didn't write down anything, then you said the two guys handed you the gun. But how do you say the gun got under the mattress?
> [The Defendant]: I said I, I put it under there.
> [Investigator Buchanan]: [The Defendant] said he put the gun under the mattress . . . . . He said the robbery was not planned. Uh he said it was not planned, he said that the clerk was inside when they first arrived and that the clerk we're speaking of the short black female in her 40's (forties). [Defendant], is there anything else you want to add or anything that I said that wasn't accurate?
> [The Defendant]: Naw that's all.
> [Investigator Buchanan]: Ok this concludes our interview the time is 6:40 a.m.

Investigator Buchanan admitted on cross-examination that he did not take fingerprints from the .38 pistol. He took pictures of the tracks in the snow, but he did not measure them. Investigator Buchanan attempted to further investigate whether there were two other participants in the robbery. Ms. Collins refused to speak to him, and he decided not to try to force her to do so. Investigator

Buchanan also confirmed that Hunt had pleaded guilty to the robbery and that the Defendant is about six inches taller than Hunt.

The Defendant chose not to testify or to present proof. The jury found him guilty of one count of aggravated robbery. He was sentenced on March 10, 2008, to twelve years in the Department of Correction. He now appeals.

**Analysis**

**I. Sufficiency of the Evidence**

The Defendant first contends that the State presented evidence insufficient to support his conviction. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

The Defendant was convicted of one count of aggravated robbery. "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Aggravated robbery includes robberies "accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-402(a).

The Defendant suggests in his brief that the State has failed to show his identity as one of the perpetrators and has not proven every element of aggravated robbery. Weathers testified that she was afraid during the robbery. As to the identity issue, the Defendant notes that Darlene Weathers

never identified him as one of the perpetrators. While this is accurate, we conclude that the State produced evidence sufficient to establish the Defendant's identity. The police followed a trail of footprints to a house in which the Defendant was found hiding under a mattress and box spring. He had near him a .38 caliber pistol that Weathers testified looked like the one used in the robbery. Most importantly, the Defendant admitted to committing the robbery in both his recorded and unrecorded conversations with Investigator Buchanan.

As to the elements of aggravated robbery, the Defendant cites to the record for the proposition that Weathers said Hunt held the gun during the robbery. This misrepresents her testimony. In the cited line, Weathers confirmed her awareness that Hunt had plead guilty to the robbery; she said nothing about him possessing the .38 pistol. As a whole her testimony clearly indicated that the taller perpetrator held the gun; other witnesses' testimony established that the Defendant is taller than Hunt. This evidence was sufficient to prove that the Defendant held the .38 pistol during the robbery, as the jury evidently did not find credible his statement to Investigator Buchanan that he had been handed the pistol after the robbery.

We briefly note that no testimony established which perpetrator physically removed Weathers' purse from the Mapco. The evidence presented would sufficiently establish the Defendant's guilt even if testimony at trial had established that Hunt took the purse. Tennessee Code Annotated section 39-11-402(2) states that a person is criminally responsible for an offense committed by the conduct of another if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." The trial court properly gave the jury an instruction on criminal responsibility. Bolstered by the Defendant's admission that he participated in the robbery, the evidence was more than sufficient to show his intent to promote or assist in the commission of the offense. We conclude that the evidence presented at trial is sufficient to support the Defendant's guilt of aggravated robbery beyond a reasonable doubt. This issue is without merit.

## II. Admission of the Defendant's Interrogation Transcript

The Defendant next argues that the trial court erred in admitting into evidence the transcript of his recorded conversation with Investigator Buchanan, parts of which the State referred to as a "confession" at certain times during the trial. The Defendant implies that the transcript was inadmissible because he "only agree[d] to statements by the interrogator," thus precluding his own statements from qualifying as a "confession" under the Black's Law Dictionary definition of that word.

The Defendant has waived this issue by failing to cite to legal authority in his brief. See Tenn. R. App. P. 27(a)(7). He has also waived it by failing to object to the statement's introduction at trial. See Tenn. R. App. P. 36(a). Defense counsel, before Investigator Buchanan's direct examination began, requested that the statement be read aloud, thus depriving the trial court of an opportunity to rule on its admissibility.

We briefly note that the transcript's admission would not have been error even in the event of a contemporaneous objection, however. We express no opinion regarding whether the Defendant's statements constitute a Black's Law Dictionary "confession." Regardless, the Defendant's agreement with Investigator Buchanan that he participated in the Mapco robbery is clearly relevant and, if hearsay, admissible as a party admission. See Tenn. R. Evid. 401, 803. This issue is without merit.

### III. Disclosure of Pre-Interview Notes

Investigator Buchanan took handwritten notes during his "pre-interview" of the Defendant. The Defendant next contends that the State committed a discovery violation in failing to hand over these notes before trial. The record contains no indication that the Defendant requested discovery before trial. Defense counsel says he failed to do so, however, because he believed he had already received all discoverable materials as a result of a discovery order the Juvenile Court apparently entered at the Defendant's earlier transfer hearing.

The Defendant has waived this issue by failing to cite to legal authority in his brief. See Tenn. R. App. P. 27(a)(7). In briefly discussing the merits of his argument, however, we assume the Defendant is alleging a violation of Tennessee Rule of Criminal Procedure 16. We need not decide whether the State violated any provision of Rule 16; even if it did, however, we conclude that the trial court complied with the remedies outlined in Tennessee Rule of Criminal Procedure 16(d)(2)(A), which states that in the event a party violates the rule the trial court may "order that party to permit the discovery or inspection; specify its time, place, manner; and prescribe other just terms or conditions." The trial court in this case gave the Defendant time to inspect Investigator Buchanan's "pre-interview" notes. Defense counsel cross-examined Investigator Buchanan about the content of the notes. They contain no exculpatory information; the Defendant thus was not prejudiced by the State's failure to disclose them. This issue lacks merit.

### IV. Sentencing

The Defendant was convicted of aggravated robbery, which is a Class B felony. See Tenn. Code Ann. § 39-13-402(b). As a Range I, standard offender the Defendant's sentencing range was eight to twelve years. See Tenn. Code Ann. § 40-35-112(a)(2). The trial court imposed the maximum sentence of twelve years. The Defendant argues that his sentence is excessive.

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999); see also State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008). If our review reflects that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then

review of the challenged sentence is purely de novo without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see also Carter, 254 S.W.3d at 344-45.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

The Defendant's conduct occurred subsequent to the enactment of the 2005 amendments to the Sentencing Act, which became effective June 7, 2005. The amended statute no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. As further explained by our supreme court in Carter,

> the trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]." [Tenn. Code Ann.] § 40-35-210(d). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," [Tenn. Code Ann.] § 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," [Tenn. Code Ann.] § 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," [Tenn. Code Ann.] § 40-35-103(5).

Id. (footnote omitted).

The 2005 Amendment to the Sentencing Act deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered these factors merely advisory, as opposed to binding, upon the trial court's sentencing decision. Id. Under current sentencing law, the trial court is nonetheless required to "consider" an advisory sentencing guideline that is relevant to the sentencing determination, including the application of enhancing and mitigating factors. Id. at 344. The trial court's weighing of various mitigating and enhancing factors is now left to the trial court's sound discretion. Id. Thus, the 2005 revision to Tennessee Code Annotated section 40-35-210 increases the amount of discretion a trial court exercises when imposing a sentencing term. Id. at 344.

To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See id. at 343; State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001). If our review reflects

that the trial court applied inappropriate mitigating and/or enhancement factors or otherwise failed to follow the Sentencing Act, the presumption of correctness fails and our review is de novo. Carter, 254 S.W.3d at 345.

The Defendant submitted no mitigating factors for the trial court's consideration in this case. The trial court's findings appear in their entirety as follows:

> [The Court]: All right. I do find that a deadly weapon, a firearm, was involved. I do find that the Defendant was the leader in an offense that involved two or more people. I do find he has an extensive criminal record, was on bail at the time of this offense and I do set his sentence at 12 years as a Standard Offender.

The trial court thus applied the enhancement factors contained in Tennessee Code Annotated sections 40-35-114(1), (2), (9), and (13)(A).

The Defendant argues, and the State concedes, that the trial court has lost its presumption of correctness because it applied some of these factors inappropriately. We agree. Because the Defendant's possession of a firearm provided the aggravating element of his conviction for aggravated robbery, the trial court erred in enhancing his sentence with a Tennessee Code Annotated section 40-35-114(9) finding that he possessed a firearm during the robbery. See Tenn. Code Ann. § 40-35-114 (noting that enhancement factors can be applied only "if not already an essential element of an offense"). The Defendant has only a juvenile record, which cannot be used to support a finding under Tennessee Code Annotated section 40-35-114(1) that he "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." See State v. Jackson, 60 S.W.3d 738, 742 (Tenn. 2001). Finally, Tennessee Code Annotated section 40-35-114(13)(A) requires that a defendant released on bail for a prior misdemeanor or felony must ultimately be convicted of that earlier crime in order for his status as a bailee to be used to enhance his sentence. The record contains no indication that the Defendant was so convicted. The trial court thus misapplied three enhancement factors.

Given the Defendant's procurement of a gun, his threatening statements to Weathers, and Hunt's presence at the robbery, the trial court was justified in finding that the Defendant "was a leader in the commission of an offense involving two (2) or more criminal actors." Tenn. Code Ann. § 40-35-114(2). The State also asks us to affirm the Defendant's sentence upon de novo review by applying Tennessee Code Annotated section 40-35-114(16), under which a court may enhance the sentence of a defendant "adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult."

One such act appears in the Defendant's criminal record: a conviction for felony evading arrest in a motor vehicle in 2003. We recognize, therefore, that two enhancement factors may apply to him. In sentencing the Defendant to the maximum of twelve years, however, the trial court misapplied three enhancement factors while also failing to place on the record any affirmative showing that it considered the sentencing principles and all relevant facts and circumstances. See

Carter, 254 S.W.3d at 344-45.  Under these circumstances, we choose to remand this case to the trial court for resentencing in compliance with sentencing procedures.

## Conclusion

Based on the foregoing authorities and reasoning, we affirm the Defendant's conviction for aggravated robbery.  We remand to the trial court for resentencing.

_____
DAVID H. WELLES, JUDGE